**UNITED STATES of America ex rel. William W. CROSSMAN, Petitioner-Appellant,**

v.

**Frank J. PATE, Warden, Respondent-Appellee.**

**No. 16757.**

United States Court of Appeals, Seventh Circuit.

March 11, 1971.

---

**536**

P. Phillips Connor, Chicago, Ill., for petitioner-appellant.

William J. Scott, Atty. Gen., Joel M. Flaum, Warren K. Smoot, James R. Streicker, Asst. Attys. Gen., Chicago, Ill., for respondent-appellee.

Before KILEY, PELL and STEVENS, Circuit Judges.

STEVENS, Circuit Judge.

In 1960 petitioner pleaded guilty to two acts of forcible rape and received consecutive sentences of 30 years from the Circuit Court of Kendall County, Illinois. In his federal habeas corpus petition he alleged that the failure to hold a sanity hearing before accepting his plea was constitutional error.[1] The district court denied the petition on the basis of the state record.

This court granted a certificate of probable cause, appointed counsel to represent petitioner, and ordered that the record be expanded to include all medical and psychiatric reports in the custody of the state criminologist. In addition, respondent also supplemented the record by filing a complete copy of the stenographic transcript of the proceedings at the arraignment and the hearing on mitigation and aggravation. Based on our review of the entire record, we have concluded that the district court properly denied the petition without a hearing.

Neither the severity of the sentence nor petitioner's guilt is placed in issue. We summarize only that portion of the record which pertains to petitioner's competence to plead and his claim that a sanity hearing should have been conducted.

I.

The crimes were committed on successive evenings. On December 28, 1959, brandishing a knife, petitioner forced his way into the victim's car in a shopping plaza in Will County and forced her to drive into Kendall County where the assault occurred. On December 29, 1959, again using a knife, petitioner forced his second victim, who was walking along the road near the same shopping center, to enter his car; he then drove into Kendall County and committed the second assault. Both victims promptly reported the incidents to the police, describing various details, including routes the cars had taken, petitioner's appearance, and, in the second case, the fact that the clock in petitioner's car was stopped at 4:45.

On January 19, 1960, Joliet police recognized petitioner's car from the second victim's description, noted the clock stopped at 4:45, and placed him under arrest. He was taken to the Joliet police station where he was questioned by the State's Attorney of Will County in the presence of his secretary and the Joliet Chief of Police. The secretary transcribed a detailed confession of each crime. The transcript indicates that the prisoner was treated with respect.[2] His

---

1. Petitioner exhausted his state remedies. In addition to the ground urged on appeal, he also alleged that his oral and written confessions were coerced; that he was improperly arrested without a warrant; and that he was not advised of his constitutional rights before the guilty plea was accepted. The record demonstrates that those contentions were without merit.

2. "Q. When were you brought in the police station in Joliet?
"A. About an hour ago.
"Q. And since you have been here, has anybody abused or threatened you in any way?
"A. No, they have been very nice.
"Q. No one has made any promises or done anything to induce or force you to give a statement; is that correct?
"A. Yes, that is correct.

answers were coherent, consistent with the facts related by the victims, corroborated by circumstantial evidence, and freely given. After the statements were transcribed, he signed them in the presence of the witnesses. Three days later he was questioned in the Kendall County jail by the state's attorney and the sheriff of that county. His oral confession at that time was consistent with his prior statement and also with the independent evidence. At the hearing on mitigation he acknowledged the accuracy of the state's attorney's description of the oral confession.[3]

On February 2, 1960, two separate informations charging him with forcible rape were filed in the Circuit Court of Kendall County. Petitioner executed a waiver of indictment, which was witnessed by his wife, and requested that counsel be appointed to represent him. The court appointed Ralph Lowe, of the Aurora Bar, and continued the matter.

The arraignment was held on February 26, 1960. On that day Mr. Lowe's partner, G. William Richards, entered his appearance as additional counsel for petitioner and represented him during the court proceedings. The state's attorney filed a receipt for various documents executed by petitioner and Mr. Richards. The court then stated his recollection that the defendant had waived indictment, which petitioner confirmed.[4] The court then explained plaintiff's right to a jury trial, described the sentence that might be imposed, and asked petitioner if he was ready to plead.[5] Petitioner responded personally and pleaded "Guilty."

Before accepting the plea, the court engaged in further colloquy with the accused:

"The Court: * * * I now ask you if you understand your rights, the nature of the charge against you and the punishment that may be fixed by the Court.

"Mr. Crossman: Yes sir.

"The Court: You still want to plead guilty?

"Mr. Crossman: Yes sir.

"The Court: Has any one made you any promises to get you to enter a plea of guilty, including the State's Attorney, the Sheriff, your own Attorney, or any police Officer or Deputy Sheriff?

"Mr. Crossman: No.

"The Court: The Court finds the Defendant understands the nature of the charge against him, the penalty that could be imposed and is making his plea of guilty voluntarily and without any promises of any kind having been made to him. The Court accepts your plea of guilty to the charge of rape and enters Judgment on the plea of guilty, judging you, William Wesley Crossman, guilty of the crime of rape as charged in the information.

"Q. In giving this statement now, knowing it can be used against you, are you giving it as a free and voluntary act?
"A. Yes."

3. "Is that substantially Mr. Crossman, what you told the Sheriff and I?
"MR. CROSSMAN: Substantially, yes.
"MR. NELSON: And that is correct?
"MR. CROSSMAN: Some of your phrasing is difficult but it is correct."

4. "THE COURT: * * * I believe he waived the right to have the matter presented to the Grand Jury and that waiver was filed in writing.
"MR. NELSON: That is correct.
"THE COURT: Is that the way you remember it?
"MR. CROSSMAN: Yes sir."

5. "THE COURT: All right, it is the duty of the Court to explain your rights to you, as the Defendant in Case 60–11. You are entitled to a Jury Trial, to be confronted by the witnesses that testify against you, you cannot be found guilty until so found by a Jury of twelve. You have a right to have witnesses subpoenaed to testify in your behalf. If found guilty, the Court could sentence you to the Penitentiary for a term of not less than one nor more than life, the Court to fix the term of punishment. I believe you have counsel. I believe that you have been given an explanation of your rights. Now, are you ready to plead to the information?
"MR. CROSSMAN: Yes sir."

The Court will hear evidence in aggravation and mitigation and recommendation of counsel. I think 10 o'clock on March 8th would be a date if no one has any objection."

The arraignment on the second information then took place; it was substantially identical to the first.

On March 8, 1960, counsel for petitioner requested a continuance of the hearing on mitigation for the purpose of having petitioner examined by a psychiatrist. Counsel stated that "there is serious doubt in my mind on the defendant's ability to cooperate with counsel." The state opposed the continuance because no question of petitioner's sanity had been raised previously. The court, after noting that everyone is considered sane until found otherwise, asked petitioner if he felt that he needed a medical examination. After petitioner replied in the affirmative, the court granted the continuance.[6]

The hearing on mitigation and aggravation was held on March 14, 1960. The state offered detailed descriptions of the two crimes, including the written and oral confessions by petitioner and certain corroborative evidence. The state's attorney then advised the court that petitioner had submitted to two psychiatric examinations, one arranged by the state and the other by defense counsel. Both psychiatrists were consultants for the Department of Safety, and both prepared written reports which were read into the record.

The report of Dr. Meyer Kruglik, dated March 8, 1960, included the following information: Petitioner had no prior record of difficulty with the law and no significant medical history. His formal education was terminated at the age of 17 in the tenth grade (he had repeated the first and seventh grades). At 18 he joined the Navy and was honorably discharged at 21 with a rating of Builder Third Class. While in service he passed the high school qualifying test. After his discharge he became interested in the ministry and enrolled at Freed-Hardeman Junior College in Tennessee, but did not finish for financial reasons. He was married in 1957 at the age of 22. In June, 1959, he was hired to minister to the Church of Christ in Morris, Illinois.

After describing the circumstances which preceded the offenses (petitioner had candidly related them to the psychiatrist), the report continued:

"Clinically, Mr. Crossman is considered to be of average intelligence. He displays no defect in orientation or memory, nor are there any findings of a central nervous disease. No hallucinations or delusions are observed or elicted, and his mood and affect are appropriate. Mr. Crossman proves himself capable of distinguishing right from wrong, recognizing the quality of his acts, and knowing that his acts were wrong. It is my opinion that he knew his acts were wrong at the time he committed them, and that he sees them, at the present time as well, as wrong morally and legally. Mr. Crossman is able to explain the nature of the charges against him and capable of cooperating in his defense.

"It is my opinion that Mr. Crossman is legally sane at this time and was sane at the time of the offenses. He does not presently fit the legal description of a sexually dangerous person because there is no evidence that his sexually assaultive behavior has existed for at least a period of a year; he is, however, an emotionally immature, passive-aggressive, dependent personality who focuses his unmet and ungratified dependent needs on genital sexual activity. He is not committable as mentally ill, in need of

6. "THE COURT: * * * Do you feel that you need a medical examination?
   "MR. CROSSMAN: I desire it very much.

"THE COURT: You desire an examination?
   "MR. CROSSMAN: Yes."

mental treatment, or as mentally defective."

After Dr. Kruglik's report was read into the record, the state's attorney advised the court that defense counsel had arranged for an examination by Dr. Edward Ross on March 10. His report was then read into the record. It included only three paragraphs.[7] Dr. Ross described petitioner as "of bright normal intelligence," and "legally sane but mentally ill." His report found petitioner to be "a sexually dangerous person." The state's attorney 'explained that this finding was, in part, based on an incident which petitioner related to Dr. Ross but had not described to Dr. Kruglik.

After the reports had been read, the state's attorney recommended consecutive sentences of 40 years each.[8] Defense counsel then argued for leniency, contending that the psychiatric reports indicated that the offenses were the result of an irresistible impulse and that with prompt psychiatric care petitioner could be rehabilitated in a relatively short time. No request was made for further testimony on the question of sanity or for the right to cross-examine either of the psychiatrists. No argument about petitioner's sanity was made.

The court explained that every person who goes to the penitentiary receives a psychiatric examination and psychiatric treatment, and commented on the seriousness of the offenses. Petitioner then asked for permission to address the court and made a reasoned if not persuasive, plea for a sentence of no more than seven years.[9] After further colloquy, the court imposed sentence.

## II.

Petitioner's contention that he was not competent to enter a guilty plea is based largely on Dr. Ross's comment that he was mentally ill even though legally sane, and on excerpts from subsequent reports by prison psychologists prepared to evaluate his progress, his need for treatment, his work assignments, and his potential for parole. We have carefully reviewed these reports and note that they consistently describe petitioner as a person of high, average intelligence, with an understanding of the significance of his offenses. The excerpts on which petitioner relies tend to explain his antisocial behavior and the risks involved in his parole, but have little, if any, bearing on the question whether he was competent to enter a plea of guilty in 1960. *Cf.*, United States v. Kaufman, 393 F.2d 172, 176 (7th Cir. 1968); see Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824; Matthews, Mental Disability and The Criminal Law

7. "This is to certify William Crossman was psychiatrically examined by me March 10, 1960 and found to be a sexually dangerous person. He had propensities for the commission of sexually abnormal activities for at least 2 years duration.

"William Crossman is a 25 year old white male of bright normal intelligence who presents features of emotionally immature, inadequate, rigid, dependent personality with a background of sexual and religious conflicts. He is considered to be legally sane but mentally ill.

"It is recommended he be committed to the Director of the Department of Public Safety so that he may receive mental care and treatment."

8. The State's Attorney of Will County joined in this recommendation, reminding the court that charges of kidnapping were pending in Will County.

9. "MR. CROSSMAN: I am not saying that society is to blame but I am saying that society is responsible to an extent. First of all, if society wished to eliminate the sexual problems of such persons as I, to the extent that that is the problem with me and I believe I could refer to it as a malady, that society has the responsibility of eliminating certain things. Look at the magazine racks all over the state and the women walking down the street, that is what I have reference to.

"THE COURT: Well did you preach that doctrine while you were preaching as a minister of the gospel?

"MR. CROSSMAN: I did.

"THE COURT: Well, a little will power on your part could have kept you from conducting yourself as you have.

"MR. CROSSMAN: I can conscientiously say that I used all of the will power that I possess."

(American Bar Foundation 1970) pp. 83–87.

The record as a whole affirmatively demonstrates that petitioner was represented by competent counsel, that he had a fair opportunity to adduce evidence bearing on the question of his sanity, that he understood the charges against him, and that he made an intelligent waiver of his constitutional right to trial. We have no doubt that petitioner was competent to plead in 1960. The *"bona fide* doubt" raised by the record in Pate v. Robinson, 383 U.S. 375, 86 S. Ct. 836, 15 L.Ed.2d 815, is not present here. *Cf.* People v. Richeson, 24 Ill.2d 182, 181 N.E.2d 170 (1962). On this record the trial judge was not required to hear any more evidence on the question of sanity than the parties offered.

As we are satisfied that the record conclusively shows that petitioner has no valid grounds for a collateral attack on the conviction, see McCarthy v. United States, 394 U.S. 459, 470, 89 S.Ct. 1166, 22 L.Ed.2d 418; Boykin v. Alabama, 395 U.S. 238, 244, 89 S.Ct. 1709, 23 L.Ed.2d 274, the judgment of the district court dismissing his petition without an evidentiary hearing is affirmed.